# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE L. ROQUE,<br><br>    Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>    Defendant.<br>_____/ | Case No. 1:17-cv-00192-SKO<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>(Doc. 1) |

On February 10, 2017, Plaintiff Michelle L. Roque ("Plaintiff") filed a complaint under 42 U.S.C. § 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). (Doc. 1.) Plaintiff filed her opening brief on January 4, 2018, (Doc. 23), Defendant filed her opposition on February 2, 2018, (Doc. 24), and Plaintiff filed her reply on February 21, 2018, (Doc. 25). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 13, 14.)

# I. BACKGROUND

On July 19, 2012, Plaintiff filed an application for SSI payments, alleging that she became disabled on June 1, 1999, due to bipolar disorder, Takotsubo cardiomyopathy[2], lower back pain, asthma, hypertension, and morbid obesity. (Administrative Record ("AR") 21, 74–75, 90–91, 170–80, 191) Plaintiff was born on July 28, 1974, and was 37 years old on the application date. (AR 29, 170.) She graduated from high school and received vocational training as a medical assistant/pharmacy technician. (AR 190.) Plaintiff completed the ninth grade and dropped out of high school during the tenth grade. (AR 42–43.)

## A.     Relevant Medical Evidence[3]

### 1.     St. Agnes Medical Center

In 2010 and 2011, Plaintiff presented to the Emergency Department, where she was observed to have anxiety and panic attacks. (AR 283, 299.)

On April 23, 2012, Plaintiff was admitted for an intentional overdose of sleeping pills and other medications. (AR 323–454.) On evaluation by the attending psychiatrist, Plaintiff stated that she had an argument with her 17-year-old daughter, whom she felt was "not listening to her" and was using drugs and staying out late. (AR 383.) Plaintiff reported that after the argument she "got angry" and took "a bunch of pills." (AR 383.) She stated that she "did not mean to die" and that she believed she could "get attention from [her] daughter and that she can listen to me." (AR 383.) She denied any suicidal or homicidal thoughts. (AR 383, 384.) Plaintiff's speech was slow and low in volume, and she had a sad and depressed mood. (AR 384.) She had good eye contact, goal-oriented and linear thought processes, intact memory, a good fund of knowledge, good attention and concentration, concrete thinking, and fair insight and judgment. (AR 384.) Plaintiff agreed to continue to take Prozac, which she would obtain from her primary care physician, as she did not want to go to the psychiatrist. (AR 384.) She was discharged from the

---

[2] Takotsubo cardiomyopathy is "a weakening of the left ventricle, the heart's main pumping chamber, usually as the result of severe emotional or physical stress, such as a sudden illness, the loss of a loved one, a serious accident, or a natural disaster such as an earthquake." *See* Harvard Medical School, Harvard Health Publishing, website, available at https://www.health.harvard.edu/heart-health/takotsubo-cardiomyopathy-broken-heart-syndrome (last visited April 16, 2018).

[3] As Plaintiff's assertion of error is limited to the ALJ's finding that Plaintiff's mental impairments were not severe, only evidence relevant to that argument is discussed below.

2

hospital on April 28, 2012. (AR 326.)

Plaintiff was placed under an involuntary psychiatric hold on August 4, 2012, for "wanting to OD on meds because life is too hard." (AR 821.) During her assessment, Plaintiff "became tearful" and stated "it wasn't an intentional OD" but that "she wants it to all stop." (AR 821.) She reported being "overwhelmed" by life, particularly by being unemployed and only receiving a small amount of money from welfare. (AR 821.) Plaintiff's mental status examination showed depressed mood and decreased insight and judgment, but was otherwise normal. (AR 823.) She was observed to be "motivated for treatment," was referred to a wellness center and outpatient drug treatment center, and prescribed Wellbutrin. (AR 824.)

On May 12, 2014, Plaintiff was again placed under an involuntary psychiatric hold for an alleged overdose of Benadryl. (AR 825–40.) Plaintiff reported that was "really upset" to find out that her youngest daughter was pregnant and started drinking alcohol. (AR 825.) She stated that she was drunk, which is why she could not be awakened, and did not take Benadryl. (AR 825.) Plaintiff reported she was just "hurt" from the news of the pregnancy and that she does not want to her hurt herself or anyone. (AR 825.) Her mental status exam was normal, except that she admitted to auditory hallucinations, stating that "[w]hen I get really upset, the voices are just random stuffs." (AR 825.) Plaintiff was discharged the same day. (AR 826–28, 830.)

### 2. Clinica Sierra Vista

In 2011, Plaintiff was observed to be "crying and sad" as she completed paperwork to obtain a wheelchair. (AR 486.)

In February 2012, Plaintiff presented with low back pain. (AR 475–76). Although she was observed to be crying, Plaintiff was noted as demonstrating the appropriate mood and affect. (AR 476.) She was oriented to time, place, person, and situation. (AR 476.) Plaintiff complained of anxiety in March 2012, with no suicidal or homicidal ideation. (AR 469.) She was oriented to time, place, person, and situation, and demonstrated the appropriate mood and affect. (AR 470.) Plaintiff reported to the attending physician she was taking Xanax once a day and was told that taking the medication in that way "will cause many problems." (AR 471.) She was prescribed buspirone and a selective serotonin reuptake inhibitor (SSRI). (AR 471.)

3

On May 25, 2012, Plaintiff complained of depression. (AR 465.) She reported "improvement of initial symptoms," but that functioning is "somewhat difficult." (AR 465.) Plaintiff presented with "anxious/fearful thoughts, compulsive thoughts, difficulty staying asleep, diminished interest or pleasure, fatigue, feelings of invulnerability, racing thoughts and thoughts of death or suicide." (AR 465.) The treatment note observed Plaintiff had recently been released from the hospital for a "suicidal gesture" of taking sleeping pills after a fight with her daughter. (AR 465.) The "suicidal gesture" was characterized as not a "true attempt" at suicide. (AR 465.) Plaintiff was advised to continue on Prozac and to add Gabapentin for pain, as it "should also help with sleep." (AR 468.) Plaintiff was observed as "anxious" in August 2012. (AR 459.)

On January 15, 2013, Plaintiff underwent a psychiatric evaluation and assessment. (AR 699–703.) Plaintiff reported she had last seen a psychiatrist in 2004. (AR 699.) She recounted three suicide attempts, most recently in April 2012, after which she was hospitalized for a week. (AR 699.) Plaintiff also reported being placed under an involuntary psychiatric hold in June 2012 due to suicidal ideation. (AR 699.) On mental status examination, Plaintiff's mood was anxious and depressed. (AR 700.) She had goal-oriented and logical thought processes, unremarkable thought content, fair insight and judgment, good memory, intact attention and concentration, average intelligence, and was oriented to time, place, person, and situation. (AR 700–701.) Plaintiff did not appear to be a danger to herself or to others. (AR 702.) She was diagnosed with bipolar mood disorder, not otherwise specified, and post-traumatic stress disorder (PTSD). (AR 702.) It was recommended that Plaintiff continue her current dose of Wellbutrin until she could follow up with the Fresno County Department of Behavior Health's Urgent Care Wellness Center. (AR 702.)

Plaintiff presented with chest pain in May 2013. (AR 784–88.) Plaintiff appeared anxious, but was deemed "stable mentally" and denied any risk of harm to herself or to others. (AR 787.)

### 3. Fresno County Department of Behavior Health

On February 12, 2013, Plaintiff reported having mood swings every day for the entire day, having depressed mood three to five times a week for the entire day, and having suicidal

4

thoughts every day for part of the day. (AR 754.) Individual and group therapy was recommended and scheduled. (AR 754.) Plaintiff called on February 19, 2013, to apologize for not being able to attend a group therapy earlier than week due to a stomach virus. (AR 755.) She denied suicidal or homicidal ideation and reported she was "doing well" other than her physical illness. (AR 755.)

Plaintiff attended an individual therapy session on February 28, 2013, and reported feeling irritable and anxious. (AR 756.) She reported "intrusive, distressing thoughts and images" that recalled a traumatic event. (AR 756.) Plaintiff was observed as tearful, was noted as being "cooperative and receptive to intervention," and "appeared interested and asked questions related" behavioral therapy. (AR 756.) Plaintiff stated she felt better after the session and agreed to practice "mindfulness." (AR 756.)

On March 14, 2013, Plaintiff reported during an individual therapy session feeling "irritable, sad, and angry." (AR 757.) She stated she "spends most days in her room." (AR 757.) Plaintiff reported that her depressed mood "doesn't allow for her to interact well with others without 'going off on them.'" (AR 757.) At another individual therapy session later than month, Plaintiff reported getting "easily agitated and having angry outburst[s]." (AR 758.) She was noted as "receptive and cooperative" and "asked questions related to intervention." (AR 758.)

### 4. Consultative Examiner Michael Cohn, Ph.D.

On November 19, 2012, psychologist Dr. Cohn performed a comprehensive psychiatric examination of Plaintiff. (AR 692–96.) Plaintiff was observed to be appropriately dressed and cooperative. (AR 692.) Plaintiff complained that she does not like to be around people. (AR 692.) She reported being able to take care of her personal hygiene tasks, including bathing and dressing, without difficulty. (AR 693.) Plaintiff is able to pay bills and handle cash appropriately. (AR 693.) She can go out alone without difficulty and reported that her relationships with family and friends are "fair." (AR 693.) Plaintiff reported no difficulty completing household tasks or making decisions on a daily basis. (AR 693.) She stated that during a typical day she eats, cooks, cleans the house, sleeps, eats, and provides care for her daughters. (AR 693.)

5

Plaintiff's concentration, persistence, and pace were adequate. (AR 693.) Dr. Cohn noted Plaintiff was "poorly groomed" and used a walker. (AR 693.) Plaintiff was able to volunteer information and appeared to be "genuine and truthful." (AR 228.) Dr. Cohn found Plaintiff's stream of mental activity was within normal limits and her speech was normally and clearly articulated. (AR 694.) She was not delusional and there was no bizarre or psychotic thought content observed. (AR 694.) Dr. Cohn found Plaintiff had no suicidal or homicidal ideation and no paranoid ideation during the interview. (AR 694.) She denied recent auditory or visual hallucinations. (AR 694.) Plaintiff's mood was noted as euthymic and her affect was within normal limits and congruent with thought content. (AR 694.) She was not tearful and denied feelings of hopelessness, helplessness, and worthlessness. (AR 694.) Dr. Cohn found Plaintiff alert and oriented and her fund of general knowledge and information was within normal limits. (AR 694.) Her ability to perform calculations and her concentration were both intact. (AR 694.) Dr. Cohn provided no diagnosis and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 75. (AR 695.) With respect to Plaintiff's mental residual functional capacity ("RFC")[4], Dr. Cohn opined that Plaintiff's mental functioning was unimpaired, with "no evidence of any psychiatric illness whatsoever." (AR 695–96.)

### 5. State Agency Consultants

State agency non-examining consultant Jaine Foster-Valdez, Ph.D., reviewed the record and assessed Plaintiff's mental RFC on December 14, 2012. (AR 82–84.) Dr. Foster-Valdez found that Plaintiff's mental impairments were non-severe and did not require any limitations. (AR 82, 84.) Upon reconsideration on September 6, 2013, another state agency non-examining consultant, Jane V. Buerger, Ph.D., reviewed the record and affirmed Dr. Foster-Valdez's findings. (AR 98, 100.)

///

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on December 20, 2012, and again on reconsideration on September 11, 2013. (AR 107–12, 116–20.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 121–27.) On February 11, 2015, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 40–68.) A vocational expert ("VE") also testified at the hearing. (AR 68–72.)

Plaintiff testified that she is unable to work because she is "very depressed," is "bipolar," has "heard voices throughout [her] life," and has "violent tendencies" triggered by noises and eye contact. (AR 44, 60–61.) Plaintiff testified that she attempted suicide three times: in April 2012, June 2012, and May 2014. (AR 48–49.) She testified that when she was hospitalized in 2012, the hospital implanted a "chip" in the back of her ear so that "[e]ither the government or the doctors . . . [or] [t]he president, the police" can "track" her. (AR 59–60.)

Plaintiff testified she received mental health treatment for about a year during that period but stopped because she did not want to talk to her provider about her issues. (AR 49–50.) Plaintiff testified she was taking Wellbutrin for her mood, which is prescribed by her primary care physician. (AR 50–51.) Although she was recommended to attend group therapy, Plaintiff did not go because she did not like talking about her issues with "a lot of people around" her. (AR 52.) Plaintiff denied having received any inpatient mental health treatment. (AR 52.)

**C.    The ALJ's Decision**

In a decision dated April 10, 2015, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 18–30.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 23–30.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since July 19, 2012, the application date (Step One). (AR 23.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: obesity and cardiomyopathy. (AR 23.) The ALJ further found, however, only mild limitations in Plaintiff's activities of daily living, social functioning and concentration, persistence, and pace, and no episodes of decompensation

7

that have been of extended duration. (AR 25.) The ALJ, therefore, found that "[b]ecause [Plaintiff's] medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere." (AR 25) (citing 20 C.F.R. § 416.920a(d)(1)).) Moreover, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three). (AR 25–26.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five. *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff retained the RFC:

> to occasionally and frequently lift and/or carry 10 pounds, stand and/or walk 2 hours in an 8 hour workday with normal breaks, sit six hours in an 8 hour workday with normal breaks, and occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl (20 CFR [§] 416.967(a)).

(AR 26.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely credible." (AR 27.)

The ALJ found that Plaintiff had no past relevant work (Step Four), but that, on the basis of the RFC assessment, Plaintiff retained the capacity to perform other work that existed in sufficient numbers in the national economy (Step Five). (AR 29–30.) In making this determination, the ALJ posed a series of hypothetical questions to the VE based upon Plaintiff's RFC. (AR 69–70.) In response, the VE testified that a person with the specified RFC could perform occupations such as document preparer, ampoule sealer, and weight tester—paper. (AR 70.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 1, 2016. (AR 10–16.) Therefore, the ALJ's decision became the final decision of

the Commissioner.  20 C.F.R. § 416.1481.

## II. LEGAL STANDARD

### A. Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  *Id.* § 423(d)(2)(B).  For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.

9

> If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process"); *id.* § 416.920(a)(4) (same). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

### III. DISCUSSION

Plaintiff's sole assertion of error is that the ALJ erred in finding at Step Two that Plaintiff's mental impairments were not severe. (*See* Doc. 23 at 5–9; Doc. 25 at 3–4.) Defendant counters that substantial evidence supports the ALJ's finding that Plaintiff's mental impairments did not cause more than mild limitations and were not severe. (Doc. 24 at 5–11.)

**A. The ALJ Committed Harmful Error at Step Two by Failing to Determine Plaintiff's Mental Impairments Were Severe.**

**1. Legal Standard**

"At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)). "[A]t the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and Social Security Ruling ("SSR") 86–8).

11

"[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability to do basic work activities." *Id.* at 1290 (citing 20 C.F.R. §§ 404.1520(c) & 404.1521(a)). "[B]asic work activities are the abilities and aptitudes necessary to do most jobs." SSR 85–28. Examples of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5) "[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28). Additionally, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

"Great care should be exercised in applying the not severe impairment concept." SSR 85–28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*, 433 F.3d at 687 (alteration in original) (quoting SSR No. 85–28).

Ultimately, "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. In other words, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at

1290 (*citing Yuckert*, 482 U.S. at 153–54). Nonetheless, "[t]he plaintiff has the burden of establishing the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014 WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014); *see, e.g.*, *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("The claimant carries the initial burden of proving a disability in steps one through four of the analysis.") (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).

   **2.   Discussion**

In determining at Step Two whether Plaintiff's mental impairments were severe, the ALJ considered (1) Plaintiff's mental health treatment records; (2) the consultative psychiatric examination report of Dr. Cohn; and (3) the opinions of the state agency medical consultants Drs. Foster-Valdez and Buerger. (AR 23–24.) The ALJ concluded that the treatment evidence failed to establish the presence of a severe mental impairment. In finding Plaintiff's mental impairments nonsevere, the ALJ noted that Plaintiff had been diagnosed with a mood disorder and prescribed "various psychotropic medications."[5] (AR 23.) The ALJ also noted Plaintiff's three psychiatric hospitalizations. (AR 24.) The ALJ concluded that Plaintiff had participated in "very little mental health treatment" and her mental status examinations were "essentially . . . within normal limits." (AR 23.)

The medical evidence in this case does not "clearly establish" the absence of a severe mental impairment. The ALJ selectively highlighted those portions of Plaintiff's mental health records that supported the ALJ's conclusion that Plaintiff's mental impairments were nonsevere, while downplaying or omitting evidence to the contrary. For example, the ALJ stated that Plaintiff reported in February 2013 "doing well other than her physical illnesses." (AR 23.) However, that same month Plaintiff reported having mood swings every day for the entire day, having depressed mood three to five times a week for the entire day, and having suicidal thoughts every day for part of the day. (AR 754.) At an individual therapy session on February 28, 2013,

---

[5] Plaintiff reported taking Xanax (AR 471), (used to treat panic disorders), Prozac (AR 384, 468), and used to treat depression and obsessive-compulsive disorder), and Wellbutrin (AR 50–51). Xanax is used to treat panic disorders, and Prozac and Wellbutrin are used to treat depression. *See* U.S. National Library of Medicine and National Institutes of Health, MedlinePlus website, available at https://medlineplus.gov/ (last visited April 17, 2018).

Plaintiff was tearful and reported feeling irritable, anxious, and having "intrusive, distressing thoughts and images" that recalled a traumatic event. (AR 756.) Similarly, the ALJ stated Plaintiff's primary care physician reported in May 2013 that Plaintiff was "stable mentally and she denied risk of harm to herself of others," but the ALJ failed to note that the same record also showed that Plaintiff "appeared anxious." (AR 787.)

In evaluating the opinion evidence, ALJ gave "great weight" to psychological consultative examiner Dr. Cohn's opinion that Plaintiff's mental functioning was unimpaired, and to state agency medical consultants Drs. Foster-Valdez and Buerger opinions that Plaintiff's mental impairments were non-severe, finding the opinions "consistent with the medical evidence of record as a whole." (AR 24) This evaluation, however, ignores the fact that Plaintiff was subsequently hospitalized for yet another suicide attempt. (*See* AR 825–40.)

While Plaintiff's three psychiatric hospitalizations do not in and of themselves establish that her impairments are "severe," *see Macias v. Colvin*, No. 1:15-cv-00107-SKO, 2016 WL 1224067, at *7 (E.D. Cal. Mar. 29, 2016), they do exemplify Plaintiff's struggle with her mental impairments. Indeed, review of Plaintiff's psychiatric hospitalization records reveals a more complicated picture of Plaintiff's mental health than that portrayed by the ALJ. For example, while the ALJ notes that Plaintiff attempted suicide in April 2012 to get attention from her daughter and that she "did not mean to die," the ALJ ignores findings that Plaintiff's speech was slow and low in volume and that she had a sad and depressed mood. (AR 383–84.) The ALJ incorrectly stated that Plaintiff's mental status examination following her suicide attempt in August 2012 was "essentially within normal limits, except for decreased judgment and insight" (AR 24), as he neglected to note her mood was indicated as "depressed." (AR 823.) Nor was Plaintiff's mental status "within normal limits" in May 2014: although Plaintiff reported she was just "hurt" from the news of her daughter's pregnancy and that she did not want to her hurt herself, the ALJ ignored the fact that Plaintiff admitted during that hospitalization to auditory hallucinations, stating that "[w]hen I get really upset, the voices are just random stuffs." (AR 825.) The ALJ also made no mention in his decision at Step Two regarding Plaintiff's testimony at the hearing, including the testimony regarding her belief that the hospital implanted a chip in

14

her head for tracking purposes. *See, e.g., Schiller v. Colvin*, No. 1:12-CV-00771-AA, 2013 WL 3874044, at *3 (D. Or. July 23, 2013) (reversing the ALJ's step two finding where the ALJ ignored, without explanation, the testimony of the plaintiff, among other portions of the medical record).

Thus, contrary to the ALJ's characterization of Plaintiff's mental health records, the record as a whole demonstrates a longitudinal history of suicidal ideation and hospitalizations, depression, and anxiety, for which Plaintiff has been treated with various psychiatric medications. *See Reddick v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998) (An ALJ may not "cherry pick" from a record to support the conclusion, but rather must account for the context of the whole record.). Moreover, evidence of limited treatment does not negate the possibility that her mental impairments were severe. The record shows Plaintiff attended a total of three individual therapy sessions in 2013 (AR 756–58), and that she stopped attending the sessions because she did not want to talk to her provider about her issues. (AR 49–50.) She did not attend any group therapy sessions because she did not like talking about her issues with "a lot of people around" her. (AR 52.) As Plaintiff points out, the Ninth Circuit recognized in *Nguyen v. Chater* that "it is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness" and cautioned that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." 100 F.3d at 1465 (citations omitted). Here, Plaintiff was involuntarily hospitalized twice and her insight and judgment were consistently found to be fair to decreased (*see* AR 384, 701, 823, 825), weakening any inference that might be drawn that Plaintiff's failure to participate in "very little mental health treatment" was because her mental impairments were not severe. *See, e.g., Fillmore v. Astrue*, No. C–10–03655 JCS, 2012 WL 298341, at *22 (N.D. Cal. Feb. 1, 2012).

While Plaintiff may not "succeed in proving that [she] is disabled," the ALJ "lacked substantial evidence to find that the medical evidence clearly established [plaintiff's] lack of" a medically severe mental impairment. *Webb*, 433 F.3d at 688. Accordingly, the ALJ's Step Two finding cannot stand.

15

Because Plaintiff was found to have at least one severe impairment (*see* AR 23), this case was not resolved at Step Two. Plaintiff does not assign error to the ALJ's finding at Step Three. Thus, any error in the ALJ's finding at Step Two is harmless, if all impairments, severe and non-severe, were considered in the determination Plaintiff's RFC. *See Lewis v. Astrue*, 498 F.3d 909, 910 (9th Cir. 2007) (holding that a failure to consider an impairment in step two is harmless error where the ALJ includes the limitations of that impairment in the determination of the residual functional capacity). The record demonstrates this was not done. (*See* AR 27–28.) The ALJ did not consider or discuss any limitations resulting from mental impairments. Rather, as part of the his assessment of Plaintiff's credibility, the ALJ merely repeated his findings from Step Two that Plaintiff had "very little mental health treatment," that her "mental status examinations have essentially been within limits," that in May 2013 she was "stable mentally," that she "did not report any hallucinations or thoughts of hurting herself or others to the psychological consultative examiner or her mental health providers," and that she was "non-compliant with her recommended health treatment." (AR 28.) As set forth above, these findings are not supported by substantial evidence. The Court therefore finds that the ALJ improperly failed to properly account Plaintiff's mental limitations in her RFC, and any error by failing to consider these limitations severe at Step Two was not harmless. *See, e.g., Inskeep v. Colvin*, No. 3:15-cv-00759-BR, 2016 WL 3509395, at *4 (D. Or. June 27, 2016) (concluding that the ALJ erred at Step Two when he found Plaintiff's mental impairments are nonsevere and finding that error is not harmless because the ALJ did not include any mental limitations in his assessment of Plaintiff's RFC.) Remand is appropriate.

**B.     Remand for Further Proceedings is Appropriate.**

The Court has the discretion to remand the case for additional evidence and findings or to award benefits. *Smolen*, 80 F.3d at 1292. The Court may award benefits if the record is fully developed and further administrative proceedings would serve no useful purpose. *Id.* Remand is appropriate when additional administrative proceedings could remedy defects. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). In this case, the Court finds that further proceedings are necessary to formulate an assessment of Plaintiff's RFC that includes Plaintiff's mental

limitations and to determine whether Plaintiff is disabled.  Accordingly, the Court remands this matter to the Commissioner for further administrative proceedings.  *See, e.g., Simmons v. Colvin*, No. CV 12–06060–AJW, 2013 WL 3337666, at *3-4 (C.D. Cal. July 1, 2013) (finding error at step two and remanding for further administrative proceedings).

### IV. CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Michelle L. Roque and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **April 23, 2018**                    /s/ *Sheila K. Oberto*
                                                         UNITED STATES MAGISTRATE JUDGE